1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KELVIN CANNON,                          Case No.  1:18-cv-00666-JLT-HBK

12                Plaintiff,                  FINDINGS AND RECOMMENDATIONS TO
                                             GRANT DEFENDANTS' MOTION FOR
13         v.                                SUMMARY JUDGMENT

14   FNU GALLAGHER, FNU GAMBOA;              FOURTEEN-DAY OBJECTION PERIOD
     FNU CHILDRESS, FNU PEREZ, FNU
15   ROCHA, FNU VANG, FNU KONG, FNU          (Doc. No.  70)
     GONSALVES, FNU TORRES, FNU
16   BRANDON, FNU HERNANDEZ, FNU
     PODSAKOFF, FNU WILSON, FNU
17   SHELBY,

18                Defendants.

19

20         Pending before the Court is Defendants' motion for summary judgment.  (Doc. No. 70,

21   "MSJ").  Plaintiff filed an opposition and Defendants filed a reply.  (Doc. Nos. 77, 86).   For the

22   reasons below, the undersigned finds no genuine dispute as to any material facts and recommends

23   the district court grant Defendants' motion for summary judgment.

24                                  **I.  BACKGROUND**

25         **A.  Allegations in Complaint**

26         Plaintiff Kelvin Cannon, a state prisoner, proceeds *pro se* on his civil rights complaint

27   filed pursuant to 42 U.S.C. § 1983.  (Doc. No. 1, "Complaint").  The gravamen of the Complaint

28   is that correctional officials at California State Prison-Corcoran failed to adhere to prison's Heat

Plan resulting in Plaintiff being exposed to excessive heat with any accommodations. Specifically, Plaintiff's alleges he was subjected to excessive temperatures in his general housing unit during the months of July and August in 2016, and in his secured management housing unit in June, July, and August in 2017.  (Doc. No. 1).  The Complaint sets forth, in diary-like fashion, the alleged temperatures in Plaintiff's cell and housing units for various dates in July and August 2016, and June through August 2017.  (*Id*. at 5-14, ¶¶7-47).  In summary, Plaintiff claims the inside temperatures in his housing units ranged from 95 to 102 degrees Fahrenheit, and even hit 105 degrees on occasion.  (*Id.*).  Despite Plaintiff repeatedly complaining to correctional officials about the excessive temperatures, he was not provided heat-related accommodations in compliance with the Heat Plan.  (*See generally id.*).  Plaintiff admits that on various dates officers provided cold water in a 5-gallon igloo container in the day room, but he complains that the water was delivered late or he was not given access to the water as frequently as he believed necessary, and he claims no other accommodations were provided, instead he was told to drink the water from his faucet in his cell.  (*Id*. ¶¶7, 8, 11, 13, 15, 16, 17, 19, 20, 22, 23, 31, 36 and 37).  Plaintiff states his medications make him susceptible to the heat and he experienced "heat stroke symptoms" that included nausea, dizziness, and blackouts on various dates because of the Defendants' lack of accommodations during these summer months.  (*Id.*).  Specifically, Plaintiff claims he suffered heat stroke symptoms in 2016 on the following dates: July 23, July 28, July 29, July 30, August 1, August 2, and August 4 (*Id*., ¶¶ 8, 13-15, 17-18, 20).  And, in 2017, suffered heat stroke symptoms on the following dates: June 21, July 22, July 29 and August 24.  (*Id*., ¶¶ 25-26, 32, 47).

In July 2016, Plaintiff claims he complained to Defendant Gallagher about the high temperatures and lack of heat-related accommodations and Gallagher retorted, that none of his subordinates would "allow no [goddamn] Black Guerrilla Family (BGF) gang member [to] dictate to his officers when or how to implement UHT policy and then added Plaintiff was becoming a thorn in defendant Gallagher's butt & wished Plaintiff [was] placed back at Pelican Bay Prison's Security Housing Unit (SHU)."  (*Id.* ¶ 5).  Later, in spring 2017, Plaintiff claims he was "coincidentally" placed inside administrative segregation and Defendant Gallagher participated in the classification

1  committee which assigned Plaintiff to administrative segregation.  (*Id.* ¶ 24).  When Plaintiff

2  reminded the committee of his need to be housed in a sector with a Heat Plan, Gallagher responded,

3  "[a] Black Guerrilla Family (BGF) is not gonna [sic] make demands regarding where to be housed."

4  (*Id.*).  As relief, the Complaint seeks monetary damages and injunctive relief.  (*Id.* at 18).

5      On March 29, 2019, the then-assigned magistrate judge issued Findings and

6  Recommendations recommending the district court permit Plaintiff to proceed on two cognizable

7  claims: a conditions of confinement claims concerning the excessive heat in Plaintiff's housing

8  unit at Corcoran during the months of July and August in 2016 and June, July and August 2017

9  against Defendants Kong, Gonsalves, Torres, Vang, Rocha, Perez, Curtis, Correctional Officer

10  Gamboa, Flores, Brandon, Hernandez. Podsakoff, Wilson, Cpt. Gallagher, and Shelby; and a First

11  Amendment retaliation claim against Defendant Gallagher.  (Doc. No. 9 at 1, 7-9).[1]

12      In relevant part, the Findings and Recommendations concluded the Complaint alleged

13  each of the named defendants, who are correctional officials at Corcoran, refused to provide

14  Plaintiff with ice cold water, or other accommodations to deal with the heat, in compliance with

15  the Uniform Heat Plan, despite Plaintiff's sensitivities to heat caused by his medication.  (*Id.* at 2-

16  5).  Further, the Findings and Recommendations summarized that Defendant "Galla[g][h]er

17  orchestrated a campaign to deprive [Plaintiff] of his heat-sensitivity accommodations in

18  retaliation for being a 'troublemaker' who files administrative grievances."  (*Id.* at 9).  The

19  District Court adopted the March 29, 2019, Findings and Recommendations in its entirety on May

20  1, 2019.  (Doc. No. 14).  Plaintiff proceeds on his initial Complaint as screened.[2]

---

21  [1] The Findings and Recommendations inferred that *Sgt. Gamboa* and C*orrectional Officer Gamboa* to be
22  *different people*, but that the defendant identified by either last name Gonzalez or Gonsalves to be the
    same person.  (Doc. No. 9 at 3, n. 3-4 (emphasis added)).  Based on the record, including Gonsalves'
23  motion to dismiss and subsequent supporting declaration, this action proceeds only against Gonsalves, not
    anyone named Gonzalez.[1]  (*See generally* docket; *see also* Doc. Nos. 21, 70-7).  The Findings and
24  Recommendations further recommended the dismissal of any other claims or defendants as non-
    cognizable, including dismissal of Defendants Daves, Castro, Sgt. Gamboa, Hence, Lee, Childress,
25  Robinson, Bell, and Wilcox.  (*Id.* at 6, 9).  Defendant Gamboa filed an Answer to the Complaint and
    therein admitted that she was a "Correctional Sergeant at Corcoran State Prison at all times relevant to the
26  Complaint."  (Doc. No. 25, ¶ 23).  Thus, it appears that Sgt. Gamboa and correctional officer Gamboa are
    the same person.
27  [2] The Findings and Recommendations afforded Plaintiff an opportunity to file a first amended complaint
    ("FAC").  (*Id.* at 10).  Although Plaintiff initially filed a FAC on April 8, 2019, he thereafter moved to
28  withdraw the FAC, which the court granted.  (Doc. Nos. 10, 11, 12, 13).

### B.  Procedural History

Defendants Curtis, Gallagher, Gamboa, Hernandez, Perez, Podsakoff, Rocha, Shelby, and Brandon, filed answers and affirmative defenses to the Complaint.  (Doc. Nos. 22-30, 33).  Defendants Flores, Gonsalves, Torres, Vang, and Wilson initially filed a motion to dismiss the Complaint.  (Doc. No. 21).  The Court granted Defendants' motion to dismiss to the limited extent Plaintiff sought injunctive relief because Plaintiff was no longer incarcerated at Corcoran, but otherwise denied the motion to dismiss in its entirety (Doc. Nos. 42, 43).  Thereafter, Defendants filed a timely motion for summary judgement.

### 1.  Defendants' Motion for Summary Judgment

Defendants submit a memorandum of points and authorities in support of their motion (Doc. No. 70-2), including a statement of undisputed facts (Doc. No. 70-3).  Defendants attach supporting sworn declarations from: Defendant Brandon (Doc. No. 70-4), Defendant Curtis (Doc. No. 70-5), Defendant Gallagher (Doc. No. 70-6), Defendant Gonsalves (Doc. No. 70-7), Defendant Gamboa (Doc. No. 70-8), Defendant Hernandez (Doc. No. 70-9), defense attorney Janet Chen (Doc. No. 70-10), Defendant Kong (Doc. No. 70-11), Doctor McCabe, Chief Physician and Surgeon at Corcoran (Doc. No. 70-12), Defendant Perez (Doc. No. 70-13), Defendant Podsakoff (Doc. No. 70-14), Defendant Rocha (Doc. No. 70-15), Defendant Shelby (Doc. No. 70-16),  Defendant Torres (Doc. No. 70-17), Defendant Vang (Doc. No. 70-18), Heat Plan Coordinator Williams (Doc. No. 70-19) and exhibits thereto including the (a) 2016 and 2017 Heat Plans (*id.* at 5-65); (b) internal temperature record logs dated May to August 2016 for housing unit 3A02 where Plaintiff was housed in general population during these months in 2016 (*id.* at 66-187); and (c) internal temperature logs dated June 2017 (Doc. No. 94) July 2017 (Doc. No. 70-19 at 188-219) and August 2017 (Doc. No. 92) for housing unit 4A4L where Plaintiff was housed in administrative segregation during these months in 2017.  Defendants subsequently filed a notice of errata, declaration from defense counsel, and a corrected declaration from the Heat Plan Coordinator, P. Williams attaching the August 2017 temperature logs to supplement the July 2017 logs previously filed for housing unit 4A4L.  (Doc. Nos. 91, 92, 92 at 4-35).  Defendants also provided temperature logs for June 2017.  (Doc. Nos. 93, 94).

At the outset, Defendants note that 15 defendants remain at this stage of the proceedings, but submit three Defendants, Wilson, Flores, and Hernandez are improperly named as Defendants. (Doc. Nos. 70-2 at 6-7; 70-3 at 2, ¶¶ 8, 9). Plaintiff "does not dispute dismissing Defendants Wilson, Flores and Hernandez in this lawsuit." (Doc. No. 77 at 2). Thus, the undersigned does not address any claims against these three Defendants and recommends the district court dismiss Defendants Wilson, Flores, and Hernandez based upon Plaintiff's voluntary dismissal.

As to the conditions of confinement claims, Defendants thoroughly review Corcoran's Heat Plan in effect for 2016 and 2017. (Doc. No. 70-2 at 7-8). In summary, Defendants argue the record fails to contain a genuine dispute of material fact as to Plaintiff's Eighth Amendment conditions of confinement claim. First, contrary to Plaintiff's allegations, the undisputed evidence demonstrates that the temperatures inside Plaintiff's housing units in July and August 2016 and June through August 2017 never reached 90 degrees. Significantly, in 2016, the temperatures were generally in the 70s, with the hottest temperature recorded as 83 degrees on August 3, 2016. Similarly, in 2017, the temperatures were generally in the 80s, with the hottest temperature recorded as 86 degrees on August 4, 2017. Further, Defendants argue that they provided Plaintiff with all accommodations required under the Heat Plan and were not otherwise deliberate indifferently to any risk of harm to him.[3] (*Id.* at 8, 12-17). In other words, Defendants argue that based on the undisputed temperatures recorded at Corcoran during the relevant time period, only Stage I of the Heat Plan was activated due to outside temperatures and the temperatures indoors did not require Stage II or Stage III protocols. Defendants further assert that as documented by their medical expert, aside from Plaintiff's self-reported assertions of heat stroke illnesses, the record lacks any evidence demonstrating Plaintiff experienced any heat-related illnesses or any other harm because of high temperatures. (*Id.* at 10-11, 12-17).

As to the retaliation claim, Defendant Gallagher argues he did not retaliate against

---

[3] It appears Defendants' subheading I contains a typographical error referencing "deliberately indifferent to any serious medical need," when the analysis that follows is a conditions of confinement analysis under the Eighth Amendment. (Doc. No. 70-2 at 12). Moreover, the screening order did not find the Complaint stated a deliberate indifference medical claim.

Plaintiff because the undisputed facts set forth in the record shows Plaintiff was not deprived of any heat sensitivity accommodations.  (*Id.* at 17-20).  In the alternative, all Defendants assert they are entitled to qualified immunity.  Defendants maintain that they did not violate Plaintiff's clearly established statutory or constitutional rights but also argue that they acted reasonably.  (*Id.* at 18-19).  In particular, they point out that they adhered to the Heat Plan and provided Plaintiff cool water when the Heat Plan was activated.  They dispute that the Heat Plan mandated that they were also required to provide cool showers and misting when the Heat Plan was activated and point to the language "cool drinks, cool showers, and/or misting" is reasonably interpreted to mean only one of the accommodations need be provided.  (*Id*. at 19).

### 2. Plaintiff's Opposition to Summary Judgment

Plaintiff filed an opposition to Defendants' summary judgment motion.  (Doc. No. 77).  Plaintiff attaches in support of his opposition: his declaration (*id.* at 42-47); inmate grievances he submitted on July 30, 2017, and related appeals (*id*. at 49-52); correctional officials' respective responses dated September 10, 2017, October 3, 2017, February 7, 2018, and June 10, 2016 (*id*. at 53-63); health care services request forms dated July 20, 2016, June 19, 2017, July 17, 2017, August 28, 2017, and responses thereto (*id*. at 64-72); medical progress notes dated June 21, 2017 (*id.* at 73-74); Corcoran's various heat related documents (*id*. at 75-79); sample housing unit inventory form from Pelican Bay State Prison (*id*. at 80-82); classification review documenting a May 2017 physical altercation incident involving Plaintiff and another inmate, identified as the victim, which resulted in Plaintiff's classification status change to administrative segregation (*id*. at 85-93), copies of certain Defendants' declarations attached to Defendants' motion for summary judgment and portions of Plaintiff's deposition transcript (*id*. at 95-133).

In summary, Plaintiff argues that the conditions of confinement due to the heat levels coupled with Defendants' failure to fully comply with the Heat Plan resulted in a violation of his Eighth Amendment rights.  (*See generally* Doc. No. 77).  Plaintiff contends that his cell was hotter than the housing unit.  (*Id.* at 4-5).  Plaintiff maintains temperatures "averaged 90 to 100 beginning at 11:00 a.m. to 8:00 p.m." (*Id.* at 6).  As evidence, Plaintiff points to Gamboa approving his inmate grievance in 2016 which directed correctional officials to allow him to leave

1   his cell to sit in the cooler dayroom.  (*Id.* at 7).

2          Regarding the months of 2017, Plaintiff states he was housed on a top tier housing unit

3   that was even warmer than the summer of 2016.  (*Id.* at 8-17).  Plaintiff points out that when he

4   went to the medical department it was often a day or two after he submitted a medical request to

5   be seen by medical.  (*Id.* at 19).  Plaintiff also asserts that in the summer of 2017, a medical

6   department response directed correctional staff to honor the Heat Plan accommodations for

7   Plaintiff to no avail. (*Id.*).  Plaintiff claims Defendant Perez told him that Gallagher ordered

8   officers to keep Plaintiff in the same cell despite his heat complaints.  (*Id.*).

9                              **3. Defendants' Reply**

10          Defendants replied to Plaintiff's opposition contending that Plaintiff's opposition and

11   supporting exhibits do not create any genuine dispute of material fact.  (Doc. No. 86 at 2).

12   Defendants reiterate that the conditions of confinement to which Plaintiff was subjected did not

13   rise to an Eight Amendment cruel and unusual standard because the unrefuted record evidence

14   shows the temperatures inside Plaintiff's housing unit(s) never reached over 90 degrees

15   Fahrenheit.  (*Id.* at 3-4).  Defendants reiterate that neither of Plaintiff's housing units posed a

16   serious risk of harm to Plaintiff.  (*Id.*).  Defendants reassert they did not know of and disregard

17   any serious risk to Plaintiff.  (*Id.* at 4-5).  And finally, Defendants note Plaintiff did not suffer any

18   physical harm because of Defendants' alleged actions or inactions.  (*Id.* at 6).

19          On the retaliation claim, Defendant Gallagher argues there is no causal connection

20   between Plaintiff's complaints of heat and Gallagher directing staff to not provide Plaintiff with

21   accommodations for the heat because the record shows the Defendants fact complied with

22   appropriate protocols of the Heat Plan.  (Doc. No. 86 at 7).  Further, Gallagher argues the record

23   shows he was not present at Plaintiff's classification hearings as evidenced by the fact that the

24   box is not checked beside Gallagher's name indicating he was present.  (*Id.* at 8) (citing Doc. No.

25   77 at 83-89).  Moreover, Defendant Gallagher argues even if he was present at the classification

26   hearing, he does not have the authority to unilaterally change an inmate's housing assignment and

27   he did not deny Plaintiff's request to be moved to lower housing unit for any improper purpose.

28   (*Id.*).  Defendants also re-assert their entitlement to qualified immunity. (*Id.* at 8-9).

7

1

## II.  SUMMARY JUDGMENT STANDARD

2          Summary judgment is appropriate when there is "no genuine dispute as to any material

3   fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is

4   material where it is (1) relevant to an element of a claim or a defense under the substantive law

5   and (2) would affect the outcome of the suit.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

6   247 (1987).

7          The party moving for summary judgment bears the initial burden of proving the absence

8   of a genuine dispute of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  When

9   the moving party has met this burden, the nonmoving party must go beyond the pleadings and set

10  forth specific facts, by affidavits, deposition testimony, documents, or discovery responses,

11  showing there is a genuine issue that must be resolved by trial.  *See* Fed. R. Civ. P. 56(c)(1);

12  *Pacific Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir.

13  2021).  A mere "scintilla of evidence" in support of the nonmoving party's position is

14  insufficient.  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  Rather, the

15  evidence must allow a reasonable juror, drawing all inferences in favor of the nonmoving party,

16  to return a verdict in that party's favor.  *Id.*

17         The court must view the evidence in the light most favorable to the nonmoving party.

18  *Tolan v. Cotton*, 572 U.S. 650, 655 (2014).  It may not weigh evidence or make credibility

19  determinations.  *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017).  Conclusory or speculative

20  testimony in affidavits and supporting papers is insufficient to raise a genuine issue of fact and

21  defeat summary judgment.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007);

22  *see* Fed. R. Civ. P. 56(c)(2).  Furthermore, the Ninth Circuit has "held consistently that courts

23  should construe liberally motion papers and pleadings filed by *pro se* inmates and should avoid

24  applying summary judgment rules strictly."  *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018)

25  (quoting *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)).  While prisoners are relieved

26  from strict compliance, they still must "identify or submit some competent evidence" to support

27  their claims.  *Soto*, 882 F.3d at 872.  Plaintiff's verified complaint may serve as an affidavit in

28  opposition to summary judgment if based on personal knowledge and specific facts admissible in

evidence.  *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).  However, a complaint's conclusory allegations, unsupported by specifics facts, will not be sufficient to avoid summary judgment.  *Arpin v. Santa Clara Valley Transportation Agency,* 261 F.3d 912, 922 (9th Cir. 2001).  And, where a plaintiff fails to properly challenge the facts asserted by the defendant, the plaintiff may be deemed to have admitted the validity of those facts.  *See* Fed. R. Civ. P. 56(e)(2).

The undersigned has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties.  The omission to an argument, document, paper, or objection is not to be construed that the undersigned did not consider the argument, document, paper, or objection.  Instead, the undersigned thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate for purposes of issuing this Findings and Recommendations on Defendants' MSJ.

## IV.  ANALYSIS

As previously stated, the undersigned considers the entire record and deems only those facts true which are properly supported by evidence.  The undersigned first addresses Plaintiff's conditions of confinement claim regarding the excessive heat against the 12 remaining defendants, and then turns to Plaintiff's retaliation claim against Captain Gallagher.

### A.  Material Facts Regarding Conditions of Confinement

Following the undersigned's review of the evidence submitted, these material facts are deemed undisputed, unless otherwise indicated:

- Gamboa and Perez were correctional sergeants (Doc. No. 70-2) (citing Doc. No. 70-3 at ¶¶ 4, 5) (*see also* Doc. No. 72 at 31, 51);

- Torres, Rocha, Vang and Kong were correctional officers who worked in Housing Unit 3A02 where Plaintiff lived in 2016 (Doc. No. 70-2) (citing Doc. No. 70-3 at ¶¶ 6, 20) (*see also* Doc. No. 72 at 35-39);

- Gonsalves, Brandon, Curtis, Shelby and Podsakoff were correctional officers who worked in Housing Unit 4A4L, where Plaintiff lived in 2017 (Doc. No. 70-2) (citing Doc. No. 70-

3 at ¶¶ 7, 25) (*see also* Doc. No. 72 at 52, 59-60).

- At all times relevant to this action, Plaintiff was incarcerated at Corcoran, serving a sentence of thirty-two years to life for second degree murder, and is a "heat plan card holder" due to medications he is prescribed, "which makes him more susceptible to high heat temperatures." (*See* Doc. Nos. 70-3 at 1-2; 70-10 at 8; 77 at 1; 70-12 ¶6).

- Corcoran has a Heat Plan in effect from May 1 through October 31, which duration may fluctuate slightly depending on the temperatures. (Doc. No. 70-3 at 3; Doc. No. 77 at 1; Doc. No. 70-19 at 5-15).

- General population inmates are permitted to have fans in their housing unit, but in 2016, when Plaintiff was housed in general population, he did not have fan because he did not purchase one. (Doc. No. 72 at 41) (Plaintiff acknowledging he did not have a fan).

- Sometime in 2017, Plaintiff was moved from general population to administrative segregation after being found guilty of battery on an inmate with a weapon from an incident occurring on May 16, 2017. (Doc. No. 70-10 at 12-14). Plaintiff alleges he moved to the higher housing unit 4A4L in the Spring of 2017. (Doc. No. 1 at 9). Defendants state Plaintiff was housed in administrative segregation in 4A4L during the months at issue in this action, June, July, and August 2017. (Doc. Nos. 70-3 at 5; 94 at 1).

- Fans are permitted in general population but are not permitted in the housing unit where Plaintiff was housed while he was in administrative segregation. (Doc. No. 70-2 at 41) (Plaintiff acknowledging no fans are permitted in administrative segregation).

*The Heat Plan*

- All CDR prisons, including Corcoran, implemented a heat plan following the decision in *Coleman v. Wilson*, Case No. CIV-S-90-0520-LKK-JFM. (*See* Doc. No. 70-3 at 2 (citing Doc. No. 70-19; Exh. 1-2); Doc. No. 77 at 1).

- The 2015 Heat Plan was in effect in 2016 and the 2016 version was in effect in 2017. (Doc. No. 70-19 at 2; *see also id.* at 5-15 (2015 Heat Plan in effect 2016); *id.* at 29-46 (2016 Heat Plan in effect 2017).

- The Heat Plan is triggered by either outdoor temperatures (Stage I) or indoors

10

temperatures (Stage II and Stage III) and provides procedures for correctional officials to monitor and record temperatures inside the housing units.  The Heat Plan also provide for alternatives or accommodations to inmates when the temperatures reach levels exceeding 90 degrees Fahrenheit, which include: not permitting heat-risk inmates outside if the temperature is above 90 degrees, having igloo coolers with cool water available for inmates, cool showers, and/or misting, among other accommodations that are dependent on the temperature in effort to prevent heat-related ailments.  (*See* Doc. No. 70-3 at 2-3; Doc. No. 70-19 at 2-3, 5-15, 34-36; Doc. No. 77 at 43).

- The Heat Plans in effect in 2016 and 2017 require the pharmacist in charge or a designee starting May 1 through October 31 to generate a weekly list of all inmates taking any designated heat risk medication. (Doc. No. 70-19 at 5-6, 29).

- The California statewide medication Heat Alert Medication List is utilized by all CDCR facilities.  (*Id.* at 6-7, 30).  The list is circulated to all staff including, but not limited to the warden, watch commanders, inmate assignment lieutenants, medical and mental health professionals, and housing unit staff.  (*Id.*).

- Stage I of the Heat Plan is activated if temperatures *outside* reach 90 degrees Fahrenheit,[4] also referred to as the Uniform Heat Trigger ("UHT").  (*Id.* at 8, 32).  If *indoor* temperatures reach 90 degrees, then Stage II of the Heat Plan is activated.  (*Id.* at 10-11, 32, 35-36).  If *indoor* temperatures reach above 95 degrees, then Stage III of the Heat Plan is activated. (*Id.* at 12, 35-36).

- According to the 2015 Heat Plan, in effect in 2016, at Stage I, Level I I/P's[5] shall be housed in Level I of any building consistent with their classification. (*Id.* at 8).  Level III/IV and SHU/PHU/I/P's may be housed in any building consistent with their classification.[6]  (*Id.*).  The first tier shall be used for heat risk Level I/P's when possible.

---

[4] All temperatures referenced in this order are measure in Fahrenheit.

[5] According to the Heat Plan, I/P stands for "inmate/patients" who are prescribed Heat Risk Medications. (Doc. No. 70-19 at 5).

[6] Some terms, such as, "Level I" I/P's do not appear defined in this record.  (*See generally* Doc. No. 70-19).

(*Id.*).  This language does not appear in the 2016 Heat Plan that was in effect for 2017.
(*See generally id.* at 31-33).

- Both Heat Plans require monitoring and recording temperatures outdoors on an hourly basis, as well as monitoring and recording temperatures inside the jail every three hours. (*Id.* at 8, 33).  Once Stage I of the Heat Plan is in effect, indoor temperatures are monitored and recorded hourly.  (*Id.* at 11).  The areas where temperatures are monitored are the non-airconditioned living areas, except for specified areas that may exceed 90 degrees, like the kitchen.  (*Id.* at 8, 32-33).

- Under both the 2015 and 2016 Heat Plans, when the temperature outside exceeds 90 degrees, strobe lights and a public-address system provides notice to all inmates of the Heat Plan activation.  (*Id.* at 8, 32).  If an inmate who takes heat risk medication is outside and temperatures reach 90 degrees, the inmate must return to the housing unit.  (*Id.*).  An inmate not taking heat risk medication has the option whether to return indoors, or not. (*Id.*).

- Both applicable Heat Plans call for ensuring heat risk inmates get equal access to programs, services, and activities during extreme weather conditions, including modified yard times during cooler periods of the day, night yard, and additional day room activities. (*Id.* at 10, 34).

- All housing units are to be provided a five-gallon igloo with cool water.  (*Id.* at 11, 35). General population inmates will have access to cool drinks, cool showers and/or misting. (*Id.*).

- Inmates housed in administrative segregation shall are given water by opening the food port on the cell door and handing them a cup of cool water from the igloo at a minimum: immediately following yard call, at the start of the third watch shift, during the evening meal, and upon request.  (*Id.*).  The Plan provides for five spray bottles to be maintained at the officer station of each housing unit labeled "UHT."  (*Id.*).  Sweat lodge activities for Native American inmates on heat alert medications are prohibited. (*Id.* at 9, 33).

- Deactivation of Stage I of the Heat Plan occurs when temperatures drop below 90 degrees

12

outside for at least one hour.  (*Id.* at 13, 37).  Stage II is deactivated when inside temperatures fall below 90 degrees for one hour.  (*Id.*).  And Stage III is deactivated when inside temperatures fall below 95 degrees for one hour.  (*Id.*).

*Temperatures at Corcoran*

- The incidents Plaintiff complains of occurred in June, July, and August of 2016 and June, July, and August 2017.

- In 2016, Plaintiff was housed in general population, housing unit 3A02, where defendants Torres, Rocha, Vang and Kong were correctional officers assigned to the pod.  (Doc. No. 70-3 at 2 (citing Doc. Nos. 70-11 at 1; 70-17 at 1; 70-15 at 1; 70-18 at 1; 1 at 2, 77 at 1, 77 at 1-10, 42-46).

- In June 2016, Defendant Sgt. Gamboa, interviewed Plaintiff in regard to his inmate grievance (602 appeal) in which he complained about that staff in Housing Unit 3A02 not providing cool water nor allowing him to sit in the dayroom, which he claimed was cooler than inside his cell, during the Heat Plan.  (Doc. No. 70-3 at 4, ¶ 17 citing 70-8, ¶¶ 2-3).  Sgt. Gamboa granted Plaintiff's request to be allowed to sit in the day room, receive cool water, or be allowed in a cooler zone until the heat subsides.  (*Id.*).  The appeal response further indicates that Plaintiff was housed on the first tier in Cell 102, due to being an inmate-patient on the Heat List.  (*Id.*).  The appeal response further indicates that Plaintiff's request to receive ice was denied and further states that his housing unit had a 5-gallon igloo, which had cool water, and that the water is kept cool by adding ice into the water.  (*Id.*).

- In 2017, Plaintiff was housed in administrative segregation, in Unit 4A4L, where Defendants Gonsalves, Brandon, Curtis, Shelby, Podsakoff were correctional officers assigned to the pod.  (*See* Doc. No. 70-2 at 51; *see also* Doc. No. 70-3 at 2) (citing Doc. Nos. 70-4 at 1, 70-5 at 1, 70-7 at 1, 70-14 at 1, 70-15 at 1; *see also* Doc. Nos. 1 at 2, 77 at 42-46).

- Plaintiff did not have a thermometer to measure the temperature inside his housing unit. (Doc. No. 70-2 at 63; Doc. No. 77 at 43).

- Heat logs produced by Defendants reflect the recorded temperatures in June through August of 2016 and June through August 2017 in Plaintiff's two housing units and confirm that the inside temperatures did not exceed 90 degrees.  (*See* Doc. No. 70-3 at 3 (citing Doc. No. 70-19 at 3 (stating temperatures *inside the housing unit* where Plaintiff was housed did not reach above 90 degrees)); Doc. No. 70-19 at 66-188 (logs for June-August 2016), 189-218 (logs for July 2017); Doc. No. 92 (logs for August 2017); Doc. No. 94 (logs for June 2017).  Based on these temperature logs, Stage I of the Heat Plan was the only plan activated due to outside temperatures.  (Doc. No. 70-19 at 3, *see also* Doc. No. 70-19 at 10-11, 32).

- The 2016 temperature logs reflect the temperature in 3A02 ranged from 67 degrees to no higher than the mid-70's in May and June.  (*Id.* at 66-135).  The first date temperatures registered higher than mid-70's was on July 11, 2016, when the temperature was recorded as 78.8 degrees in 3A02, but the following day temperatures registered in the low 70's.  (*Id.* at 136-137).  The first time the temperature reached 80 degrees inside was on July 25, 2016, between 1800 and 2100 hours.  (*Id.* at 150).  From July 25 to August 7, 2016, the temperatures registered consistently between the high 70's and the low 80's but returned to the mid-70's on August 9, 2016.  (*Id.* 151-165).  The remainder of the August temperatures fluctuated, but more often than not registered in the mid-70's until August 24, 2016, when there were some 80-degree readings, and from that date on, mostly cooler temperature readings in the high 60's and 70's.  (*Id.* at 165-180).

- In 2017, the temperature logs reflect readings for housing unit 4A4L and depict similar temperatures ranging from 70's to mid-80's.  (*Id.* at 189-219; Doc. No.  92 at 4-35; Doc. No. 94 at 4-33).  Plaintiff was held in administrative segregation at this time and his housing unit was located at a higher floor than his housing unit was in 2016.  (Doc. No. 70-10 at 12-14).  Generally, the month of June 2017 shows temperatures in the mid-70's ranging to the mid-80's with the highest reading of 85 from June 23 to June 25, 2017. (Doc. No. 94 at 2-34).  Later in June 2017, temperatures drop to the low 80's.  (*Id.* at 29-33).  Similarly, the logs from July and August 2017 reflect consistent temperatures in the

14

low to mid-80's.  (Doc. No. 70-19 at 181-219; Doc. No. 92 at 1-34).  Unlike the lower housing unit, however, no temperature readings reflect 60 degrees in June, July and August 2017 in housing unit 4A4L.  The temperature logs fairly consistently registered in the low to mid-80's during these months.  (*See generally* Doc. No. 92). Only twice did temperatures reach the highest level of 86 degrees on August 30 and August 31, 2017. (*Id.* at 33-34).

### *Plaintiff's Medical Records*

Plaintiff's pertinent medical records reflect the following:

- On July 20, 2016, Plaintiff submitted a 7362 Health Care Services Request Form stating he was experiencing severe nausea and dizziness due to excessive heat.  "Not afforded minimal UHT patients [sic] cool water. Need intervention." (Doc. No. 70-12 at 8).  The medical form was marked as received by medical on July 21, 2016.  On July 22, 2016, Plaintiff was seen in the medical department and was treated for cough and sore throat and prescribed medication for his symptoms.  Plaintiff also told staff he experiences nausea and dizziness when he could not get cold water.  (*Id.* at 10).  But "he's been ok the last couple [of] days."  Staff discussed importance of hydration with Plaintiff, his vitals were recorded as normal, and he was released from medical in stable condition.  (*Id.* at 9-10).

- Plaintiff's medical file for the remainder of 2016 reveals no other heat-related complaints. (*Id.* at 3 ¶7:3-4).

- On June 19, 2017, Plaintiff submitted 7362 Health Care Services Request Form Request form marked "Emergency" stating: "Documented UHT patient for past 12 years. Notified alerted file 602, granted 2016 here at Corcoran 3A yard and still to date pleading with custody and medical to not posture, deliberate indifferent [sic] to affording me UHT accommodations and yet I receive absolutely no accommodations, dizzy and nausea all evening 6-16-6-19-17."  (*Id.* at 11).  The 7362 request was received on June 20, 2017, at 0718.  (*Id.*).  The form notes "I/P, [was] offered to go to TTA,[7] per I/P 'just want to

---

[7] "TTA" stands for treatment and triage area.

document want to be accommodated.'" (*Id*.).  Staff advised Plaintiff to drink plenty of water and notify staff if symptoms become worse.  (*Id*.).  Nursing staff saw Plaintiff on June 21, 2017, at which time he reiterated he wants "to make sure [he] is getting the ice in the building [he] should be getting when the temperature reaches 90 degrees in the building." (*Id*. at 12).  Notes indicate Plaintiff arrived ambulatory with steady gait denied nausea, dizziness, SOB, fatigue.  Staff found respirations unlabored and Plaintiff not in any distress.  (*Id*)  Staff advised Plaintiff to avoid going outside and to drink plenty of water and notify staff is he exhibits any "heat stress symptoms." (*Id.*).  Plaintiff also saw his primary care doctor this same day but no complaints about heat-related illness were discussed.  (*Id*. at 13-15).

- On July 17, 2017, Plaintiff submitted another 7362 Health Care Request Form stating, "Again tried to alert 4A4L floor staff to call a medic today 7/17/17 let you all know I'm dizzy, blacking out, nauseatic [sic] approx. 12 noon.  Floor staff 4A4L refuse to call you and continues not distributing UHT cool water protocol.  Cell 16L inside is like a 'hot cave' forcing me to stay under the cell vent causing severe distress on my back.  I can die in this cell." (*Id.* at 16).  A triage nurse reviewed the request on July 19, 2017, at 0708. (*Id.*).  Plaintiff was evaluated by nursing staff on July 20, 2017, during which he denied nausea, vomiting, dizziness or headaches.  (*Id.* at 17).  Plaintiff told medical he wanted his complaints documented so if something happened to him, his family could sue.  (*Id.*). Medical confirmed Plaintiff's vitals were all normal, including unlabored breathing.  (*Id.*). Medical staff advised Plaintiff to continue to ask for cool water and notify medical staff immediately if he experienced dizziness, nausea or blacking out.  (*Id.*).  Medical confirmed Plaintiff was taking medications making him susceptible to heat and forwarded UHT list to Sergeant Perez but determined no further medical evaluation or transfer to a higher level of care was necessary.  (*Id.*).

- On August 28, 2017, Plaintiff submitted another 7362 Health Care Request for Services, stating: "nauseatic (sic), dizzy, blackouts periodically 8/28/17 – Cell 16 L 4A4L feels like extremely hot torture chamber.  Repeatedly ask for cool 10-gallon igloo water and

repeatedly ignored.  Didn't get ice in 10-gallon igloo until after dinner 5:45 pm.  First cool
water distribution 2nd watch refusing to put ice in 10-gallon igloo at breakfast." (*Id.* at
18).  This request was received on August 29, 2017, at 7:14 am. (*Id.*).  Mr. Cannon was
seen by nursing staff on August 30, 2017, at which time he denied any current dizziness,
nausea, vomiting, headache, shortness of breath, or pain. (*Id.* at 19).  His vital signs were
stable, and the treating medical staff determined that he did not need further medical
evaluation or transfer to a higher level of care.  (*Id.*).

- No documentation exists in Plaintiff's 2016 or 2017 medical records that he was ever
  diagnosed with heat stroke or any heat-related illness.  (*Id.* at 4, ¶ 12).  There is no record
  that Plaintiff was ever transferred to the treatment or triage area for of the facility or
  transferred to an outside emergency room or hospital for treatment of heat-related illness
  during 2016-2017.  (*Id.*).

- Plaintiff's expert, Conrad McCabe, M.D., opines that no documentation suggests Plaintiff
  "suffered demonstrable harm as a result of his claim of not being provided heat-risk
  medication related accommodations." (*Id.* at 5, ¶14).

**B.  Law on Conditions of Confinement Under the Eight Amendment**

The Eighth Amendment to the United States Constitution prohibits cruel and unusual
punishment, interpreted as the "unnecessary and wanton infliction of pain" that is "grossly
disproportionate to the severity of the crime" and "totally without penological justification."  U.S.
Const. Amend. VIII; *see also Rhodes v. Chapman*, 452 U.S 337, 345-46 (1981) (internal citations
omitted); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  Undeniably the Eighth Amendment
does not require comfortable prisons, but it does require humane ones.  *Farmer*, 511 U.S. at 832.

A prisoner pursuing an Eighth Amendment conditions of confinement claim must
establish both an "objective component" and a "subjective component."  *Farmer*, 511 U.S. at 834.
The objective component relates to the seriousness of the challenged conditions while the
subjective component speaks to the state of mind of the officials responsible for the alleged
violation.  *Id.*; *see also Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (rejecting a reading that the
Eighth Amendment allows liability on prison officials solely because of the presence of

17

objectively inhumane prison conditions).  The objective component requires a prisoner to demonstrate "unquestioned and serious deprivations of basic human needs" or of the "minimal civilized measure of life's necessities."  *Rhodes*, 452 U.S. at 347; *accord*, *Wilson*, 501 U.S. at 308.  Basic human needs include "food, clothing, shelter, medical care and reasonable safety" as well as "warmth [and] exercise."  *Helling v. McKinney*, 509 U.S. 25, 32 (1993); *Wilson*, 501 at 304.

To be a serious deprivation, the prisoner must at the very least show that a condition of his confinement "pose[s] an unreasonable risk of serious damage to his future health" or safety. *Helling v. McKinney,* 509 U.S. 25, 35 (1993).  Generally, only the most severe deprivations under the objective prong will support an Eighth Amendment violation but the standard "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society" because "no static 'test' can exist."  *Rhodes*, 452 U.S. at 346 (citations omitted).  Consequently, "[m]ore modest deprivations can also form the objective basis of the violation, but only if such deprivations are lengthy or ongoing."  *Johnson v. Lewis*, 217 F.3d 726, 732 (9th Cir. 2000).

High temperatures accompanied by inadequate cooling or other heat-related accommodations for prisoners can in some circumstances constitute an objectively, serious conditions of confinement.  *See Coleman v. Wilson*, Case No. CIV-S-90-0520-LKK-JFM P, 1994 U.S. Dist.  Lexis 20786 (E.D. Cal. June 6, 1994)(discussing heat and medication related deaths of three inmates receiving medication at California Medical Facility in 1991, thereby requiring CDCR to implement hot weather emergency plans); *Vensor v. Schell*, 657 F. App'x 695 (9th Cir. 2016)(reversing and remanding district court grant of summary judgment to defendants concerning an inmate having two one-hour transports in non-air-conditioned van and finding genuine dispute of  material fact as to whether the conditions were sufficiently serious in violation of the Eighth Amendment)(citing *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000)(following a prison riot, addressing inmates held four days outdoors, without shelter or accommodations, with temperatures from 90 degrees during the day to 70 degrees at night, rain one of the nights, and no toilet facilities)).  *But see Raugust v. Ferriter*, No. CV-07-55H-DWM-RKS, 2008 WL 5436016, at *1 (D. Mont. June 11, 2008) (finding complaint by prisoner alleging 90 degree

1  temperatures in their cells without fans failed to state an Eight Amendment violation as such

2  conditions alone not extreme); *Chandler v. Crosby*, 379 F.3d 1278, 1298 (11th Cir. 2004)

3  (finding temperatures between 80 and 90 degrees, and temperature in excess of 90 degrees

4  occurring 9% of the time, during months of July and August not extreme and unconstitutionally

5  excessive).  Thus, whether the situation of which a prisoner complains is sufficiently serious and

6  extreme will depend upon the circumstances of a particular case, the nature of the condition, and

7  the duration of condition and/or a deprivation.

8       Under the subjective prong, a correctional official must have "acted with a sufficiently

9  culpable state of mind" with regard to the condition at issue.  *Hudson*, 503 U.S. at 8.  The proper

10  standard in a § 1983 action for a prisoner is "deliberate indifference."  *Farmer*, 511 U.S. at 834;

11  *Wilson v. Seiter*, 501 U.S. 294, 303 (1991).  Negligence is not enough.  *Wilson*, at 305.

12  Deliberate indifference is equivalent to "subjective recklessness" as it is used in criminal law and

13  requires the correctional official to "both be aware of facts from which the inference could be

14  drawn that a substantial risk of serious harm exists, and he must also draw the inference."

15  *Farmer* at 837

16       **1. Objective Conditions of Confinement Not Violative of Eighth Amendment**

17       Plaintiff's Complaint alleges he experienced unbearable heat during the summer months

18  of 2016 in housing unit 3A02 and 2017 in housing unit 4A4L and faults the individual defendants

19  for their failure to abide by the protocols in the applicable Heat Plan.  Plaintiff claims the

20  temperatures exceeded 95 degrees and sometimes exceeded 100 or 105 degrees.  Plaintiff admits

21  he did not have a way to measure the temperature inside his housing unit.

22       Defendants provide temperature logs that recorded temperatures during all relevant time

23  periods, multiple times a day, inside both of Plaintiff's housing units.  The logs evidence that the

24  inside temperatures never exceeded 90 degrees during the summer months in either 2016 or 2017.

25  In 2016, the logs reveal that temperatures inside Plaintiff's housing unit generally were in the 70s,

26  with the hottest temperature recorded at 83 degrees on August 3, 2016.  The logs similarly

27  demonstrate that the temperatures in June, July and August 2017, were warmer in Plaintiff's

28  higher housing unit (4A4L), but registered consistently in the 80's, and never reached higher than

19

1    86 degrees on August 4, 2017.  (*See* Doc. No. 70-19 at 180-219; Doc. No. 92; Doc. No. 94).

2            Plaintiff's laymen estimates as what the temperatures were in his housing unit in 2016 and

3    2017 are insufficient to overcome Defendants' evidence of the temperatures during the relevant

4    periods.  As judges, we lack "carte balance to impose [our own] theories on penology of the

5    nation's prisons" and should rely on objective factors to the maximum extent possible.  *Rhodes*,

6    452 U.S. at 337, 346 (internal citations omitted).  While 80-degree temperatures indoors without

7    access to a fan or cool water misting may be uncomfortable, the Court does not find them and

8    extreme and/or inhumane to be violative of the Eighth Amendment.  *See e.g., Keenan v. Hall,* 83

9    F.3d 1083, 1091 (9th Cir. 1996)(affirming district court grant of summary judgment on prisoner

10   plaintiff's claim that temperatures were "well above" or "well below" room temperature, but

11   reversed on prisoner's other conditions of confinement claims, including his ventilation claim);

12   *Dixon v. Godinez*, 114 F.3d 640 (7th Cir. 1997)(affirming with respect to district court's grant of

13   summary judgment in favor of defendants when prisoner claimed various conditions including

14   poor ventilation in the summer months violated the Eighth Amendment because conditions

15   presented did not fall below minimal civilized measures of life's necessities);  *Woods v. Edwards*,

16   51 F.3d 577, 581 (5th Cir. 1995)(noting that extreme heat may constitute cruel and unusual

17   punishment under the Eighth Amendment, but affirming district court's decision granting

18   defendants' motion for summary judgment when prisoner plaintiff complained about the heat, but

19   did not present medical evidence sufficient to state an Eighth Amendment violation).; *but see*

20   *Blackman v. Kukua*, 758 F.Supp.2d 398, 408-409 (S.D. Tex. Dec. 2, 2010)(finding objective

21   prong of  Eighth Amendment satisfied when reported temperatures were in excess of 100 degrees

22   indoors for 27 days and medical evidence was submitted showing plaintiff lost 20 pounds due to

23   the high temperatures without sufficient heat accommodations).

24           Further, Plaintiff admits he was permitted a fan in general population but did not buy one,

25   had ventilation inside his cell[8] and there is no dispute that Plaintiff had access to drinking water

26   from the sink inside his cell.  And he admits that correctional officials consistent with the

27   _____

28   [8] Plaintiff admits that he stood under cool air flowing from the vent in the ceiling inside his cell.  Doc. No. 70-12 at 16.

20

protocols under the Stage 1 Heat Plan brought an igloo with cool water but complains officials did not bring it as early as they should have,[9] or he was not given access as frequently as he desired, or officials should have offered additional accommodations provided by the Heat Plan, such as misting or permitting him to sit in the cooler day room.   To the extent Plaintiff argues correctional officials alleged failures to adhere to the Heat Plan's protocols, results in *per se* constitutional violation, Plaintiff's argument fails.   There is no federal constitutional liberty interest in compliance with state prison regulations.  *Solomon v. Felker*, 2:08-CV-02544 JFM P, 2013 WL 5375538, at *12 (E.D. Cal. Sept. 24, 2013) ("Plaintiff's allegation that the defendants failed to adhere to the prison's own institutional policies and procedures does not, by itself" give rise to a constitutional violation); *Sandin v. Conner,* 515 U.S. 472, 481–82, (1995) (recognizing prison regulations are "primarily designed to guide correctional officials in the administration of a prison" and are "not designed to confer rights on inmates"); *Hovater v. Robinson,* 1 F.3d 1063, 1068 n. 4 (10th Cir. 1993) ("[A] failure to adhere to administrative regulations does not equate to a constitutional violation."); *see also Armstrong v. Warden of USP Atwater,* No. 1:10–CV–173 DLB HC, 2011 WL 2553266, at *8 (E.D. Cal. June 24, 2011) (citing same).

### 2. Defendants Were Not Deliberately Indifferent

Here, having found the record presents no dispute of material fact that the conditions of Plaintiff's conferment were not objectively, sufficiently serious, the Court need not continue to the subjective prong of analysis.   Nonetheless, in abundance of caution, the Court further finds the record presents no genuine dispute of material fact concerning whether any of the named Defendants acted with deliberate indifference.

Each of the Defendants present sworn declarations under oath attesting that they neither had knowledge nor witnessed any risk of threat to Plaintiff caused by the indoor temperatures. (Doc. No. 70-4 at 2)(Brandon stating "I have never been informed nor did I ever have reason to believe that the temperature inside Plaintiff's cell posed a threat to Plaintiff's health in 4A4L);(*see also* Doc. Nos. 70-5 at 2 (Curtis regarding 4A4L temperatures did not pose a threat),

---

[9] Plaintiff acknowledges he received cool drinks but claims he "had to beg for them."  (Doc. No. 72 at 26).

Doc. No. 70-6 at 3 (Gallagher regarding either 3A02 or 4A4L temperatures did not pose a threat), Doc. No. 70-7 at 1-2 (Gonsalves regarding 4A4L temperatures did not pose a threat), Doc. No. 70-8 at 1-3 (Gamboa regarding 3A02 temperatures did not pose a threat), Doc. No. 70-11 (Kong regarding 3A02 temperatures did not pose a threat), Doc. No. 70-14 at 1-2 (Podsakoff regarding 4A4L temperatures not posing a threat), Doc. No. 70-15 at 1-2 (Rocha regarding 4A4L temperatures not posing a threat), Doc. No. 70-16  (Shelby regarding 4A4L temperatures not posing a threat), Doc. No. 70-17 at 1-2 (Torres regrading 3A02 temperatures did not pose a threat), Doc. No. 70-18 at 1-2 (Vang regarding 3A02 temperatures not posing a threat).

The record also belies Plaintiff's allegations that he suffered any heat-related ailments. Dr. McCabe, Defendant's expert, reviewed each of Plaintiff's medical records over the period in question in both 2016 and 2017 and found no evidence that Plaintiff suffered any heat-related ailments. *See* Doc. No. 70-12.   Indeed, the record reveals that Plaintiff made only one complaint in 2016 to medical about the heat, and medical staff determined that Plaintiff required no further treatment.  Similarly, in 2017, Plaintiff complained to medical staff on three occasions about the heat, but examinations indicated no further evaluation or treatment was required.  In fact, Plaintiff apparently recognized he was not in distress by refusing to go to T&T on one occasion.  Further, Plaintiff does not allege on any specific date that he requested to go to medical and was denied treatment by any specific defendant.  Nor does Plaintiff identify any Defendant ever found him passed out or in distress.  And none of the Defendants working shifts in Plaintiff's housing unit ever reported seeing Plaintiff "blacked out" or facing any other heat-related ailments.  To the contrary all Defendants state under oath they had no reason to believe Plaintiff was at risk of any harm.  (*See* Doc. Nos. 70-11, 70-15, 70-17, 70-18) (summer 2016), (Doc. Nos. 70-4 at 2; 70-5 at 2; 70-7 at 2; 70-14 at 2; 70-16 at 2) (summer 2017).

While an inmate need not await a tragic event before seeking relief from the challenged condition, he must at the very least show the condition posed an unreasonable risk of serious damage to his health or future health or safety.  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  Here, the record shows Plaintiff's vital signs were consistently recorded as within normal ranges and he reported no heat related medical issues while physically present in the medical department.

1   (*Supra* at 15-17).  Plaintiff's self-reported medical ailments that, upon physical examination, were

2   not noted by medical staff, as not sufficient to overcome the unrefuted evidence in the record that

3   there is no physical evidence of Plaintiff experiencing any heat-related ailments.  Absence of

4   injury is not irrelevant in the Eighth Amendment context.  *See e.g., Wilkins v. Gaddy*, 559 U.S.

5   34, 38 (2010).  For example, in an excessive use of force case, to determine whether the force was

6   excessive in violation of the Eighth Amendment, absence of serious injury is an indication as to

7   the amount of force used.  *Id.*  The same analogy applies here.  Absence of substantiated heat-

8   related ailments is an indication that the temperatures Plaintiff endured were not what he

9   professed.  Based upon the record, the undersigned cannot conclude that any correctional officials

10  drew an inference that a substantial risk of serious harm existed for Plaintiff, yet alone that they

11  failed to act.

12        It appears Plaintiff's primary issue is with what he perceives as the failure by correctional

13  officials to provide him with the type of accommodation he wanted, particularly when he was

14  detained in administrative segregation during the summer of 2017.  (*See* Doc. No. 72 at 23,

15  stating "[o]bviously if I'm in solitary confinement, I won't have access to the night yard, however

16  if I'm in the Ad. Seg and I'm on top tier, I can be put in a lower tear in a cooler zone. So that's

17  one way they could accommodate me.").  While a court must make all reasonable inferences in

18  favor of the non-moving party, when a court is faced with a record containing only a mere

19  scintilla of evidence in support of a party's position, the court need not permit the case to go to a

20  jury.[10]  Here the record presents substantial unrefuted evidence documenting the temperatures

21  inside Corcoran fluctuated between the 60's and 80's and did not exceed the low to mid-80's

22  during either the summer of 2016 or 2017.  *Supra* at 10-11.  Plaintiff admits he had ventilation,

23  access to water in his sink in his cell, and correctional officials made available an igloo cooler

24  with cold water and that while on segregated confinement he was provided with cold water, albeit

25  he needed to ask for it.  The record also documents that Plaintiff, at his request, repeatedly went

26  _____

27  [10] For example, the complaint alleges on July 30, 2016, the temperatures reached 105 degrees and Plaintiff
    was allocated his first 5-gallon igloo cool water (Doc. No. 1 at 6), but the temperature logs recorded hourly
    that day reflect indoor temperatures never exceeding 82 degrees.  (Doc. No. 70-19 at 155).

28

to the medical department for evaluation, consultations, and medical care as needed.  (*Supra* at 11-13; *see also* Doc. No. 70-12; Doc. No. 77 at 49-52).

Consequently, the undersigned recommends that the district court find the Defendants are entitled to judgment as a matter of law on Plaintiff's Eight Amendment conditions of confinement claim because the evidence of record including hourly logs of the temperature inside the housing units coupled with records of Plaintiff's visits to the medical department reporting normal vital signs, and lack of physical substantiation of any heat-related medical ailments, shows no genuine dispute of material fact as to both the objective and subjective prongs of the Eighth Amendment conditions of confinement analysis.

### C. Undisputed Material Facts – First Amendment Retaliation Claim

As previously stated, the undersigned considers the entire record and deems only those facts true which are properly supported by evidence.  The undersigned turns to Plaintiff's retaliation claim against Defendant Gallagher.

- Gallagher was the Correctional Captain assigned to 3A during 2016 and 2017.  (Doc. No. 70-6, ¶2).

- Plaintiff arrived at Corcoran on December 3, 2015, from Pelican Bay State Prison and "was a validated Black Guerilla Family Member."  (*Id.*, ¶3).

- Gallagher was the Chairperson for Plaintiff's classification committee hearings held on January 7, 2016, and April 13, 2016. (Doc. No. 70-10 at 8-10 (documents identifying Gallagher as chairperson for the January 7, 2016, and April 13, 2016, classification hearings).  These two 2016 classification hearings concerned whether Plaintiff should remain on single-cell status. (*Id.*).

- Classification committee documents for hearings held December 7, 2016, and November 30, 2016, April 4, 2017, May 24, 2017, and November 2, 2017do not identify Gallagher as either the chairperson, recorder, correctional counselor, or member of the committee.  (*See* Doc. Nos. 70-10 at 12-17).

- Plaintiff was moved to administrative segregation sometime after May 2017 because of a physical altercation with another inmate.  (*See* Doc. No. 70-10 at 12-14) (detailing

altercation between Plaintiff and another inmate and institutional administrative hearings related thereto).

- The parties dispute whether Gallagher participated in Plaintiff's May 16, 2017, classification hearing.  Defendants point out that the evidence Plaintiff submits from his classification hearing evidences that Gallagher did not attend the hearing.  (*See* Doc. No. 86 at 8 (noting the check box next to Gallagher is not marked on the form indicating he was not present)).  The issue regarding Gallagher's participation, or not, at the May 16, 2017, classification hearing is not material for purposes of Plaintiff's retaliation claim based on the record.  Classification hearings are comprised of a committee and Plaintiff does not dispute the rules violation report for assault on another inmate at issue in the May 16, 2017, hearing.  (*See id*.).

**D.  Law on First Amendment Retaliation**

To prevail on a claim founded on retaliation under the First Amendment, a plaintiff must show five requisite elements: (1) he or she engaged in a protected conduct; (2) defendant took adverse action against the plaintiff; (3) a causal connection between the adverse action and the protected conduct; (4) the official's acts would chill a person of ordinary firmness from future exercise of First Amendment rights; and (5) the action did not reasonably advance a legitimate correctional goal.  *See Watison v. Carter*, 668 F.3d 1108, 1114; *see also Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).   To survive a summary judgment motion, "the plaintiff must demonstrate there is a triable issue of material fact on each element of his claim."  *Brodheim v. Cry*, 584 F.3d 1262, 1269 n.3 (9th Cir. 2009).  Mere speculation that a defendant acted with a retaliatory animus is not sufficient.  *Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014)(collecting cases).

Filing an inmate grievance is protected conduct.  *Rhodes*, 480 F.3d at 568.   Regarding the second element, adverse action taken against the prisoner "need not be an independent constitutional violation.  The mere *threat* of harm can be an adverse action."  *Watison*, 668 F.3d at 1114 (internal citations omitted).  The causal connection between the adverse action and the protected conduct can be inferred from an allegation of a chronology of events.  *Pratt v. Rowland*,

25

65 F.3d 802, 806 (9th Cir. 1995).

### 1. **No Evidence of Retaliatory Action Taken Against Plaintiff**

Plaintiff's First Amendment claim of retaliation proceeds only against Defendant Gallagher. (Doc. No. 9 at 9). Plaintiff alleges acts of retaliation from Gallagher began after he filed a grievance regarding the heat at Corcoran. (*See* Doc. No. 72 at 29) (Plaintiff alleging Gallagher stated he wasn't going to let Plaintiff dictate his program). Plaintiff does not clearly define what specific retaliatory acts he attributes to Gallagher. In general terms, Plaintiff alleges Defendants kept refusing to provide him with accommodations and housed him in a hotter housing unit at Gallagher's direction, complains about his reference to Plaintiff being a "Black Guerilla Family Member," and intimates that Gallagher was involved in having him moved to secure management housing in 2017.

While the Complaint adequately alleges the basic elements of a retaliation claim, the record currently before the Court shows Plaintiff, who was serving a life-sentence, was a Black Guerilla Family Member and was moved to administrative segregation for legitimate penological reasons sometime after May 2017 due to a physical altercation he had with another inmate on April 16, 2017, involving a weapon. (Doc. Nos. 70-10 at 12). Plaintiff does not dispute that he had the physical altercation with an inmate involving a weapon. To the contrary, classification hearing records Plaintiff filed depict Plaintiff's presence at the classification hearing for assault and battery on another inmate with a weapon.[11] (Doc. No. 77 at 85) (Plaintiff's exhibits depicting classification review for scheduled hearing commencing May 24, 2017)). While the parties dispute whether Gallagher in fact even had a role in the operative classification hearing due to the checkmark not appearing beside Gallagher's name on the form, and a checkmark appears beside the other two committee members' names, the record nonetheless shows any classification decision was made by a committee, and not solely made by Gallagher. (Doc. No. 77 at 88). *Pratt*, 65 F.3d. at 810 (noting the decision to move the plaintiff-inmate was for legitimate

---

[11] Further, although not material for purposes of the claims in this action, Plaintiff acknowledges other rules violations including that he is a member of the "black guerilla gang" and previously tried to murder a correctional officer while incarcerated. These facts support placement in a single cell, which Plaintiff does not dispute, or detention on administrative segregation following his physical altercation with a weapon.

1   correctional need, or neutral, objective reasons, and not in retaliation, defeated inmate plaintiff's

2   retaliation claim).  Further, like *Pratt*, the record shows Plaintiff was moved to administrative

3   segregation as a result of his rules violation report involving a physical altercation with a weapon

4   not for any retaliatory purpose.

5          Other than his speculation that the other Defendants refused to provide him with

6   accommodations at the direction of Defendant Gallaher, Plaintiff provides no evidence that

7   Gallagher gave such order.  And significant is the above factual findings that the temperatures in

8   Plaintiff's housing unit during the summers 2016 and 2017 were not as high as Plaintiff perceived

9   and Plaintiff had accommodations, including cool water available to him in general population or

10  upon request in administrative segregation.  *See Harbridge v. Schwarzenegger*, 752 F. App'x 395,

11  397 (9th Cir. 2018) (affirming district court's decision to grant defendants' summary judgment

12  motions when the record showed a single missed meal was not caused by the plaintiff filing

13  grievances and record showed legitimate reasons for confiscation of plaintiff's property).  The

14  record is devoid that any adverse action was taken against Plaintiff, other than his being moved to

15  segregation after assaulting another inmate.  At most, the record alleges Gallagher verbally

16  bantered with Plaintiff and informed him that he would not run the institution but did not threaten

17  Plaintiff with harm.  Consequently, the undersigned finds Plaintiff's First Amendment retaliation

18  claim fails as a matter of law.

19         **E.  Qualified Immunity**

20         Defendants also raise the defense of qualified immunity.  (Doc. No. 70-2 at 18-20; Doc.

21  No. 86 at 8-11).  Because the undersigned has determined the record does not contain a genuine

22  dispute of material fact as to whether any Defendant violated Plaintiff's statutory or constitutional

23  rights, the Court need not address whether Defendants are entitled to the affirmative defense of

24  qualified immunity.

25         Accordingly, it is **RECOMMENDED**:

26         1.  Defendants Hernandez, Williams and Flores be dismissed with prejudice pursuant to

27  Plaintiff's stipulation to dismiss these Defendants.  *Supra* at 3:3-4.

28         2.  Defendants' motion for summary judgment (Doc. No. 70) be GRANTED in its

1   entirety.

2                           **NOTICE TO PARTIES**

3          These findings and recommendations will be submitted to the United States District Judge

4   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  **Within fourteen (14)**

5   **days** after being served with these findings and recommendations, a party may file written

6   objections with the court.  The document should be captioned "Objections to Magistrate Judge's

7   Findings and Recommendations."  Parties are advised that failure to file objections within the

8   specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834,

9   838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

10

11   Dated:   __March 31, 2022__

12                                          HELENA M. BARCH-KUCHTA
                                           UNITED STATES MAGISTRATE JUDGE
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                           28